Good morning. Good morning. Good morning ladies and gentlemen of the court. Doug Phelps appearing on behalf of the defendant Randy Zacherle. Your Honor, in this matter we had several issues that we brought before the court. One was the issue of a warrantless search of a computer and in that particular case the government relied on an argument that the computer had been abandoned. I think the evidence shows that he didn't abandon the computer. The judge made a finding of abandonment. The judge did make a finding. Did we review that for, don't we review that for clear error? That's correct. And why was it clearly erroneous? Well because I think that the testimony was that Randy Zacherle told Ms. Mesquita that he was intending to return and that he planned on returning but that he was locked up in jail. So he never had, the fact was that Ms. Mesquita, whose house he was living in, had been advised that he planned on returning. She believed he planned on returning. And in fact he told the FBI agent McEwen that his sister had stolen the computer and he was aware of that. And so Ms. Mesquita, whose house he was living in and working for his room and board there, knew that he planned on returning. He had told her that he planned on returning. When did you tell her that? The testimony on that was at ER 166. Just tell me what he said. And when. I think the testimony was from Ms. Mesquita that he had told her when he left that he. When he left. When he left that he intended to return. Okay. And then when he was in prison he had no access to a telephone? Well he was locked up in a jail, a tribal jail. And I think she testified that. No, my question was he had no access to a telephone? I would think that he would have access to a phone there in the jail. I don't have independent knowledge. His mom came and got his car. I believe the mother indicated that he had contacted her and that she at one point did go get his car there at her house. And he didn't tell his mother to pick up the computer? I don't know that. I think that he had indicated to her that he wanted her to pick up at least his car and some belongings. So he could have asked her. But there's no evidence that he did. So his landlord, his landlady, didn't have any information for what, three months? I think that she talked to him. I think her testimony was that she had talked to him in July. And that she knew he was going to get surgery and that his father was in the hospital. He was going to have hip surgery, which he did have. Okay. And that at that point she thought that he was going to return. At that point? At that point. When was that point? When he left? When he left. Yeah, but there is a space of three months where he's not done anything. Well, I think in part there was a time when he was with his father who was in the hospital and then his hip surgery. I understand that. There may be periods of time, but three months. You know, is she supposed to just assume she's a storage unit for all this time? Well, I think that she indicated that she, indeed, when his sister Pam Bob went into the room and took the things, she said that she never took any of his things. She left them there. I think that indicates that she had an intention to protect this property. Well, wasn't there conflicting evidence of something that she was just going to sell his stuff or have a yard sale or, I don't know, garage sale? You know, there may have been a statement by her at one point that that was what she thought about doing. She never did that, I think, the evidence. Well, I know, but we have to think, okay, everything that the judge heard and then the judge decided after the judge could have said, I don't think he abandoned it. I think he was locked up, and so then you didn't have a right. But on the other hand, there were conflicting facts that came about. I mean, well, it's undisputed that he was gone. It's undisputed of when he went to jail. But then the landlord, you know, I mean, there's all sorts of things. I mean, you say he was staying there and worked for his rent. Then there's some evidence to say he was only supposed to stay there 10 days. But 10 days turned into two years, and he wasn't really keeping, you know, he wasn't really working for his keep, but once in a while he would do something. So, I mean, you know, someone could look at that and say, hey, the guy just, you know, he overstayed his welcome. He didn't even really, you know, I mean, it's questionable what rights he had even to that. And then there's testimony that he would leave the door to his room open and that he wasn't, so the judge heard a lot of stuff. And maybe the judge could have come to the same conclusion you're asking, but there's also evidence he could have come to the other conclusion. I think the important testimony to consider is the testimony of. . . Well, but still, okay, but if there is conflicting testimony and there's some basis for the decision that the judge came to, how can we say that's clear error? Well, I think because FBI agent McEwen testified at ER 206 that when he talked to Randy Zachary, he advised him that his sister had stolen his computer and that Pam Bob and Ms. Mosqueda agreed that he would never have allowed them to take the computer or to release the computer. And that was at ER 249 and ER 250. So I think when you have the FBI agent saying that he knew that Randy Zachary told him that the computer had been stolen, you have Ms. Bob and Ms. Mosqueda saying that he would never have allowed those computers to be released to her. I think the weight of the evidence then is. . . to address the waiver issue. Right, and I think that's important, too. That's a de novo review situation, and the argument was that essentially it was an admission by silence, and we're arguing that it was a selective invocation. I think what's. . . It was a little ambiguous, though, wasn't it, about what he. . . Well, I think it could be interpreted as ambiguous, but I think what's important, though, is that this occurred at the same time when Detective Damien Stewart was with him, and he had told Detective Damien Stewart that he could search the computer, and indeed Detective Stewart did search the computer and found no child pornography on the computer. So the suggestion is that his reaction at the time he had consented to the search of the computer was a reaction out of guilt that they were going to find child pornography on the computer, and they didn't. So Detective Stewart searched the computer, apparently didn't use the sophisticated enough of a program, and found no evidence of that. So the government maintained their position was when he doubled over in a fetal position in response to a question about did you download child pornography onto that computer, that that somehow or other was an admission. I think that runs contrary to him at that time telling Detective Stewart, go ahead and search my computer, and his reaction could have very well been to any of a number of things, the fact that he was being arrested for failure to register or many other things. So your theory then is that his reaction wasn't because he feared what they had found, but at that time his belief was they couldn't find anything. Well, indeed he told them to search, he gave them permission, and they did search at that time, and they didn't find anything. I think he believed that they wouldn't find anything because they'd been erased. He may have been technologically challenged and not recognized the sophistication of the FBI. Are there any cases that really discuss this kind of physiological response and interpret that as an invocation of the right to remain silent in response to a specific question? Well, I believe Doyle kind of addresses that, and I think it would have been in a different- Well, but is there any case that says that you could construe that kind of physical response or this act of curling up into a fetal position? And I think we argued the United States v. Lorenz, which is the Ninth Circuit case, 570, 294- Was that a physical response kind of thing? Right, that it was a physical response. What was the nature of the physical response in that case? Oh, I'm sorry. I didn't write that down. I thought he just remained silent. I thought he just didn't answer the question. You rely upon the fact here that you put significance into the fact that he curled up into this fetal position. Well, I don't think that I did. I think the government argued that that was a visceral response that allowed them to give that testimony. My position was that he was an invocation of silence by not answering. And you placed no real significance. No, and I think the reason for not placing significance on that, again, is that at that time he allowed them to search. And then the government comes in at trial and says, then in an opening statement, that that is a reason for the jury to believe that he's guilty or that he's refused to answer the question. And then again, they hit it during the testimony of the United States Marshal. And then they hit it again in closing, suggesting that this movement shows some admission of guilt on his part. Okay. We've got your argument. Thank you. May it please the Court. My name is Vanessa Waldriff, and it is my pleasure to argue on behalf of the United States of America. Good morning. Appellant raised three issues in his brief, which do not support disturbing the defendant's conviction and sentence here. The Fourth Amendment issue, the Double Jeopardy issue, and the Fifth Amendment issues. And I can go into the district court's oral ruling regarding the motion to suppress on the abandonment issue. As Judge Paez noted, it is a clear error review. And here the facts, as articulated by Judge Van Sickle in his oral ruling at the pretrial hearing on the motion to suppress, focus on three major areas. How Mr. Zacherle's overstaying house guest status did not indicate a strong interest in his retention of his privacy interest in his computer in that room. The length of time after he departed the home where he had been staying as a guest with Miss Muscata at the request of his mother. And also the opportunities that Mr. Zacherle had to indicate to Miss Muscata, the homeowner, or others, that he intended to return to her home or that he had any specific instructions for how she should treat the possessions in his room. I'm kind of in a Hobson's choice in terms of if he tells someone to go get the computer and hide it, then if I were the prosecutor, I'd be arguing consciousness of guilt. He knew that there was this stuff on there, or he just hopes that no one will find it and lets it lie. But he's not really saying it's not his computer, and he can't really go on his own. He's not saying it's not his computer, that's true. He did have the opportunity to convey information to Miss Muscata. The facts, as articulated in the district court's ruling, articulate how he had sent a letter to Miss Muscata, just had general greetings, didn't indicate that he would return or that request to keep his possessions in order or private. And he also had been able to communicate with his mother regarding his possessions. So the district court found that that did indicate he had opportunity to try to take an effort to preserve privacy in that computer, and he did not do so, and that factored into the totality of the circumstances test for the abandonment finding. Is there any significance to the fact that he deleted files? I don't believe there is much significance to the deleting. So I guess your position would be that once he abandoned that computer, they could search it high and low. They could search every file possible. Under the Fourth Amendment, the Fourth Amendment is not implicated if he no longer has a privacy interest in the computer. So once he's abandoned it, there is no more issue regarding any search. So, yes, Your Honor. Whether he deleted it or not. Yes, the deletions would not have affected that Fourth Amendment issue upon the ruling of abandonment. Okay. Why don't you address the fetal position? Sure. There's, I think, two issues here. One, that the district court also ruled on a motion to suppress under the Fifth Amendment, and there was a finding that Mr. Zacherle, the defendant, had waived his Miranda rights. He was read his Miranda rights on that April 29, 2013, the day of the interview. When asked if he understood them, he responded, sure. They're not challenging the overall waiver. They're arguing Lorenzo selective waiver. Lorenzo actually speaks to this kind of situation, and Lorenzo, he didn't say anything. Yes, Your Honor. The Lorenzo case ruled that there is this possibility of a selective invocation. But the Lorenzo court actually ruled that a defendant who replied no comment or remained silent over the course of an interview in which he had answered some questions and waived his Miranda and then answered more questions after an intermittent silence did not re-invoke or invoke his Miranda rights during the course of that interview. That's right. So, in this case, there is not a complete silence. You're relying on the fact that you're affirmatively saying his reaction, which his reaction is to curl up. Now, you're saying what? That that's on all fours with Lorenzo? Well, I think there are two answers. One is that it is a response. It's a nonverbal response, which is properly admissible. Expressive conduct. Expressive conduct, yes, Your Honor. So that type of physical response is properly admitted, and it's not an invocation of Miranda. Why is it not an invocation? You're just saying one possible interpretation. One possible interpretation is guilt. He's fearful. On the other hand, the other interpretation is he doesn't want to. He's not going to answer that question. And those are both interpretations, Your Honor, but they do not implicate the Fifth Amendment here because under the case law regarding what is a clear invocation after a waiver has occurred is very strong that a defendant needs to affirmatively assert his desire to remain silent. Unambiguously assert. Unambiguous, yes, Your Honor. Thank you. Well, but if so, it's allowed under the law to say, I want to talk to you about this, but I don't really want to talk to you about that. And just because you don't want to talk about a particular subject matter doesn't mean you don't want to talk to the police anymore, right? Yes, it is. A person is permitted to speak to some issues and not others, but they need to make an affirmative statement as to I'm not going to discuss those issues and to invoke the Miranda rights. Here, we don't have any, again, no issue regarding the initial waiver of the Miranda rights. And then over the course of an interview where he answered questions before and after a nonverbal response, there's no selective invocation under. Well, that's your conclusion. Those are all conclusory. So what is confronting us in this case is somewhat novel. The question is, does it constitute, and you went there, so I'll take you back there and bring this. Was it unequivocal? Was his response unequivocal? No, yeah. Was the invocation of selective waiver or negating his prior consent to be questioned unambiguous? And your position is? Well, certainly his response was not an invocation. He never verbally requested to stop the interview and, in fact, continued the interview. He expressly invoked it. The question we're dealing with, counsel, is what you've called, and I agree, is expressive conduct. And the expressive conduct could be construed as an unambiguous expression of a desire not to waive his right to remain silent at that point. Any case that's dealt with that kind of situation? For expressive conduct, I don't have a case specifically on those issues. My argument focused more on times when an individual has remained silent or not answered a question in the course of an interview, which I think does factor into this analysis here where we have a valid waiver, at most an ambiguous non-statement where he's moving and providing a response through his behavior, but that does not change the Fifth Amendment analysis under his requiring an unequivocal invocation of his Miranda rights. That's an interesting question. I was looking for cases, and that's why I asked counsel, whether there are any cases that have expressive conduct in them like this. Well, I think the one case which may be on point, Your Honor, is Pino Noriega, where there was an individual who was told by an officer of the Department of Homeland Security, is this what happened, kind of recounting an event to that individual. And that individual's silence, who in the course of the time of providing information to the government official, gave information before and after silence, and that testimony did come in because it was deemed to be a part of her overall response. By not responding, it's permissible that that could come in after a valid Miranda waiver. What's the case? Pino Noriega, and that's at 189 F3rd 1089. I also have other cases, though, that follow Lorenzo, too. Yes. Ford and Lorenzo are both strong cases in this circuit that go to the issues of that you need to really have an unequivocal invocation of your Miranda rights after they've been waived. Okay. Thank you. No further questions? We ask that the conviction be affirmed. Thank you. Got a minute. All right. What's important here is that, again, his reaction there was at the same instance that he had told them that they could search the computer. And it was our position that it was a selective invocation that's addressed in Lorenzo. The next question that was posed to him, did he answer it? I don't know that they posed any other questions. I think the testimony was that they stopped it. I think that after that, when he curled up, I think there was, at that point, a break. And I don't know that they ever resumed it after that point is my recollection of what occurred. So what does that tell us? Well, I think that tells that essentially it's an invocation of his right to remain silent. But even if the court were to say, we don't know if that was an invocation of his right to remain silent, and it's a selective invocation, or whether or not this then is an insolubly ambiguous statement, then under Doyle and Shepard, where the risk of confusion is great, the evidence is to be excluded. And Shepard was a 1933 case, Shepard v. United States, 290 U.S. 96 at 104. So I think if nothing else, it falls in that area. We don't know. But if you don't know, then it's to be excluded. It's not to be allowed. But I would maintain that we know because that he was asserting the right to remain silent because he had allowed them to search the computer. And the suggestion here that tilts the balance in favor of the government is that that was really an admission of guilt or somehow an admission of guilt. Thank you. Thank you. We're going to take a quick 10-minute recess.
judges: Fisher, Paez, Callahan